**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA UNGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 C 2780** |
| | ) | |
| **v.** | ) | **Mag. Judge Michael T. Mason** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Sandra Unger ("Claimant") has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's request for Disability Insurance Benefits under the Social Security Act ("Act"), 42. U.S.C. §§ 416(I) and 423. The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is granted, the Commissioner's motion is denied and this case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

**I.     Procedural History**

Claimant filed an application for Disability Insurance Benefits ("DIB") on August 26, 2002. (R. 54-56). In her application, she alleged an onset date of July 31, 1990.

1

(R. 54).  Her application was denied initially on October 28, 2002 and again on July 7, 2003 after a timely request for reconsideration.  (R. 30-33, 35-38).  Claimant then requested a hearing on August 4, 2003.  (R. 41).  The hearing was held on September 15, 2004 before ALJ Richard J. Boyle.  (R. 296).  Claimant testified at the hearing as well as Medical Expert ("ME") Dr. John Cavenagh.  (R. 300-11).  ALJ Boyle issued a written decision denying Claimant's request for benefits on December 2, 2004.  (R. 12-20).  The ALJ found that Claimant did not become disabled prior to the expiration of her date last insured ("DLI"), June 30, 1996.[1]  (R. 20).  The Appeals Council then denied Claimant's request for review on March 29, 2005 and ALJ Boyle's decision became the final decision of the Commissioner.  (R. 5-7); *Estok v. Apfel*, 152 F. 3d 636, 637 (7th Cir. 1998).  Claimant subsequently filed this action in the district court.

## II.    Medical Evidence

Claimant was diagnosed with poliomyelitis, a viral infection affecting the central nervous system, in 1956.  (R. 155, 255).  She was three years old at the time.  (*Id.*).  Soon after her diagnosis, Claimant reported that she underwent fascia transplant surgery.  (R. 255).  For the next several years, Claimant wore leg braces.  (*Id.*).

Claimant visited Sherman Hospital for x-rays in August of 1980 and again in October of 1984.  The x-ray dated August 14, 1980 indicates marked deformities of Claimant's lumbar spine and pelvis as well as poorly developed iliac bones.  (R. 283).  This x-ray report also notes the presence of rotatory scoliosis in the lumbar region of the

---

[1]In order to receive Title II disability insurance benefits, Claimant had to prove that she was disabled on or before June 30, 1996, her date last insured.  *Meredith v. Bowen*, 833 F. 2d 650, 652 (7th Cir. 1987).

spine.  (*Id.*).  The x-ray dated October 5, 1984 states that there is a considerable degree of deformity of the rib cage on account of marked dorsolumbar kyphoscoliosis (an outward curvature of the lumbar spine).  (R. 282).

On December 1, 1989, Claimant saw her cardiologist, Dr. Timothy Wang, at the Valley Medical and Cardiac Clinic.  (R. 125).  Dr. Wang noted Claimant's history of polio, five previous back operations, and multiple leg operations "to correct the ravages of her polio." (*Id.*).  Dr. Wang noted that Claimant's physical examination was unremarkable "except for her multiple muscular skeletal problems."  (*Id.*).  At the time of Dr. Wang's examination, Claimant was already taking Vasotec for hypertension.  (*Id.*).  Dr. Wang performed a cardiac examination, an electrocardiogram, and an echocardiogram on Claimant and concluded that she did not suffer from any organic heart problems.  (*Id.*).  However, in light of Claimant's hypertension and history of palpitations, Dr. Wang prescribed Inderal.  (*Id.*).

Claimant complained of severe left hip pain and had an x-ray of her left hip and spine taken on April 25, 1994.  (R. 281).  The x-ray showed severe scoliosis of the lumbar spine, deformity of the pelvis, extensive spondylosis and mild arthritic changes in the left hip consistent with a finding of right sacroiliitis.  (*Id.*).

Claimant saw Dr. Wang again on May 4, 1994.  (R. 119, 124).  Dr. Wang noted Claimant's "severe scoliosis."  (R. 119).  He further noted that she was "moderately obese" and had put on weight since her last visit in 1991.  (R. 119, 124).  Dr. Wang also reported that Claimant's heart palpitations were "quite well controlled" by the Inderal he had prescribed to her in 1989.  (R. 119).  Dr. Wang also noted that Claimant had complained of "pain in the hips when she walks" and had subsequently cut back on

exercising.  (*Id.*).  Dr. Wang advised Claimant to continue to exercise and recommended a stationary bicycle as the best method of exercise in light of Claimant's hip problems.  (*Id.*).  He then renewed Claimant's prescriptions of Inderal for heart palpitations and Vasotec for blood pressure.  (*Id.*).

An x-ray dated February 26, 1996 indicates marked kyphoscoliosis of the thoracolumbar spine.  (R. 280).

Claimant returned to Dr. Wang's office on several occasions during the period from 1996 to 1999.  On July 12, 1996, Dr. Wang noted an increase in Claimant's cholesterol level and made an initial recommendation of diet changes.  (R. 123).  On June 11, 1997, Dr. Wang prescribed a series of medications including Monopril, Metoprolol, Dyazide and Lipitor to control her cholesterol levels.  (R. 121).  In a report dated April 23, 1999, Dr. Wang indicated that Claimant's EKGs had not changed since her first visit in 1989 and she exhibited no evidence of a previous myocardial infarction. (R. 117).  He also noted Claimant's long standing history of scoliosis secondary to previous polio.  (*Id.*).  He encouraged Claimant to lose weight and recommended regular exercise in light of her skeletal abnormalities.  (*Id.*).

Claimant saw her new primary treating physician, Dr. Akhileswari Yeshwant, for the first time on April 1, 1999.  (R. 186).  At that time, Dr. Yeshwant reported that Claimant was 4' 8" and weighed 186 pounds.  (R. 187).  Dr. Yeshwant noted Claimant's kyphoscoliosis and indicated that she may suffer from postpolio syndrome.  (*Id.*).  On May 11, 1999, Dr. Yeshwant noted that Claimant's weight had increased to 188 pounds and she complained of no longer being able to walk a block.  (R. 185).  Dr. Yeshwant recommended Claimant gradually increase the length of her walks and suggested she

avoid fats and red meat.  (*Id.*).

Claimant visited Dr. Yeshwant again on August 3, 1999 complaining of pain in her lower back that radiated down her left leg.  (R. 184).  Dr. Yeshwant diagnosed Claimant as suffering from both sciatica and a lumbar sprain and prescribed rest, limited exercise, and painkillers including Advil and Naprosyn.  (*Id.*).  Dr. Yeshwant noted that Claimant stated she "babysits her granddaughter".  (*Id.*).

Claimant was seen at the Emergency Room at Provena St. Joseph Hospital on October 3, 1999 after slipping on a wet driveway and injuring her right lower ribs.  (R. 127-130).  Dr. Walter Drubka examined Claimant and noted her obesity, her history of polio "with chronic deformity," and her previous back surgeries.  (R. 130).  Claimant was released with instructions to avoid strenuous activity.  (R. 129).  The next day, October 4, 1999, an x-ray of Claimant's ribs revealed no rib fracture but showed a markedly disfigured rib cage on account of a kyphoscoliotic spinal deformity.  (R. 131).

Claimant returned to Dr. Yeshwant's office on October 21, 1999.  After examining Claimant, Dr. Yeshwant reported that there was no irregularity present in her heartbeat.  (R. 182).

On November 9, 2000, Claimant made her first visit to Dr. Archana Goel.  (R. 179).  Dr. Goel noted that Claimant's blood pressure was high and advised her to restart her Dyazide prescription for her hypertension.  (*Id.*).  He also noted Claimant's kyphoscoliosis.  (*Id.*).

Claimant saw Dr. Goel again on February 22, 2001, complaining of muscle cramps and weakness in her legs and back.  (R. 177).  Dr. Goel's records note postpolio syndrome.  (Id.).  He advised Claimant to discontinue Lipitor for her leg

5

cramps.  (*Id.*).

Dr. Goel examined Claimant on June 7, 2001, and recorded that she weighed 190 pounds.  (R. 176).  Dr. Goel noted Claimant's obesity and prescribed Phentermine, an appetite suppressant.  (*Id.*).  He also indicated that her postpolio syndrome was stable.  (*Id.*).

Dr. Goel's September 19, 2001 records indicate that Claimant had decreased her weight to 176 pounds.  (R. 173).  Claimant reported that she tired easily and that she suffered from muscle aches and cramps, particularly during the day.  (*Id.*).  Dr. Goel's physical examination of Claimant revealed no muscle atrophy or muscle tenderness. (*Id.*).  Dr. Goel prescribed Meridia, another appetite suppressant, in addition to Claimant's preexisting medications.  (*Id.*).

During the next few months, Claimant visited Dr. Goel's office for several follow-ups.  On November 14, 2001, Dr. Goel noted that Claimant had lost 22 pounds over the course of 5 months.  (R. 171).  Claimant stated that she felt "much better" though she admitted that she was "not exercising much".  (*Id.*).  On January 18, 2002, Claimant reported that her ability to exercise was limited because of her weak leg muscles, but overall she felt better.  (R. 170).

Claimant complained of chest pain and shortness of breath and visited Sherman Health Systems for a myocardial perfusion study on June 6, 2002.  (R. 149).  Dr. Ajay Mehta analyzed the study and concluded that the results were normal with no evidence of reversible ischemia or a previous infarction.  (*Id.*).  Dr. Mehta also noted Claimant's obesity and history of hypertension.  (*Id.*).

Claimant visited Dr. Goel once again on June 21, 2002 and complained of feeling

fatigued and waking up "awful tired."  (R. 166).  Dr. Goel recorded Claimant's statements and suggested that she undergo a sleep study.  (*Id.*).

Claimant was evaluated by neurologist Dr. Stanya Smith at The Center for Neurology, SC on August 5, 2002.  (R. 155-157).  Claimant complained of weakness and fatigue and becoming exhausted after doing household activities.  (R. 155).  Dr. Smith noted that Claimant admitted to "a very active physical life" that included caring for a grandchild.  (*Id.*).  However, Claimant reported that she does not exercise and her walking was limited.  (*Id.*).  Dr. Smith performed a physical examination of Claimant and found significant atrophy of the right leg muscles including the thigh and calf muscles.  (R. 156).  Right leg muscle tone was decreased as compared to the left leg and muscle stretch reflexes were absent in the lower extremities at both the knee and the ankle.  (*Id.*).  Dr. Smith further noted that Claimant had a wobbly gait and that her left leg appeared shorter than her right.  (*Id.*).  He noted quite severe scoliosis in the thoracic spine.  (*Id.*).  Claimant could not perform good heel/toe walk and was slightly unsteady on tandem walk.  (*Id.*).  However, Dr. Smith reported that Claimant was able to walk without any help.  (*Id.*).

Dr. Smith concluded that Claimant presented with symptoms that "are very suggestive" of postpolio syndrome.  (R. 156).  Dr. Smith advised Claimant to continue to lose weight and suggested that she continue to exercise under the supervision of a physical therapist for general strengthening of her lower extremities and paraspinal muscles.  (R. 157).

Claimant visited Midwest Physical Therapy on several occasions between August 6, 2002 and October 1, 2002 for physical therapy.  (R. 289, 213-19).  Claimant's

physical therapist, Kristen Dilmas, performed an initial evaluation on August 6, 2002 and reported that Claimant demonstrated significant weakness in the bilateral lower extremities as well as moderate weakness in the lumbar extensors. (R. 289). She also reported that Claimant presented with signs and symptoms consistent with postpolio syndrome. (*Id*.). By August 12, 2002, Claimant demonstrated an increase in her knee extension but reported fatigue and pain in her knees and ankles. (R. 219). In addition to her therapy sessions, Claimant also reported that she went to her community pool to do exercises on her own. (R. 215).

After concluding her therapy sessions at Midwest Physical Therapy, Claimant went to Dr. Goel's office for a check-up on October 11, 2002. (R. 163). Claimant reported that she started water exercises but complained of leg and hip pain. (*Id*.). Claimant also reported no improvement in her condition. (*Id*.).

On October 10, 2002, Claimant visited the Sherman Hospital Sleep Lab for a sleep study conducted by Dr. Firas Dairi. (R. 269). Dr. Dairi noted that there was evidence of obstructive sleep apnea and ordered a consultation by Dr. Daniel Nepomuceno, a Sleep Medicine Specialist. (R. 269, 263). On November 11, 2002, Dr. Nepomuceno diagnosed Claimant with obstructive sleep apnea and recommended she undergo CPAP titration treatment. (R. 266). By December 31, 2002, Claimant had begun her CPAP treatments with no complaints regarding its usage. (R. 265).

On October 17, 2002, Dr. Earl W. Donelan conducted a residual functional capacity assessment of the Claimant. (R. 221-228). Dr. Donelan's notes indicate that Claimant's claim for disability benefits was denied for lack of evidence as a result of Claimant's failure to submit medical evidence for the period prior to her date last

insured.  (R. 228).

Claimant visited another neurologist, Dr. Michael M. Minieka, on December 9, 2002 for postpolio syndrome evaluation.  (R. 255).  Claimant reported that she had started to notice weakness and fatigue and that physical therapy was unhelpful in treating these symptoms.  (*Id.*).  Dr. Minieka examined Claimant and noted significant weakness in her hip flexors bilaterally and mild weakness in the hip adductors and abductors.  (*Id.*).  The report also indicated decreased reflexes at the knees with no reflexes and decreased range at the ankles.  (*Id.*).  Dr. Minieka reported severe kyphoscoliosis.  (*Id.*).  Dr. Minieka concluded that Claimant exhibited evidence of old polio with probable superimposed lumbar and cervical radiculopathy.  (*Id.*).  He recommended Aleve for treatment.  (*Id.*).

Claimant returned to Dr. Minieka's office on January 2, 2003 for a follow-up appointment.  (R. 253).  Claimant had begun CPAP treatment and reported an increase in her energy since beginning treatment.  (*Id.*).  Claimant also stated that the pain in her left hip had increased.  (*Id.*).  An electromyography of Claimant's wrist revealed right median neuropathy of the right wrist, evidence of degeneration and re-enervation consistent with her history of polio, but no evidence of radiculopathy.  (R. 241).  Dr. Minieka prescribed physical therapy for treatment of postpolio syndrome.  (R. 252). Later that day, occupational therapist ("OT") Noelle E. Polk evaluated Claimant and recommended an orthotic fitting to treat her right medical neuropathy.  (R. 249).

A therapist at the Rehabilitation Institute of Chicago's Arthritis Center conducted an initial evaluation of Claimant on January 20, 2003.  (R. 247-248).  The therapist's

assessment noted Claimant's fatigue, weakness in the legs, back pain, and significant gait and postural deficits. (R. 247). Claimant subsequently attended three therapy sessions at the Center from January 24, 2003 until February 24, 2003. (R. 231-33). Claimant was outfitted with a heel lift and a posture support brace to correct gait and postural abnormalities on February 7, 2003. (R. 231, 250).

On February 25, 2003, Claimant visited another OT, Nicole L. Campbell, complaining of numbness, tingling, and pain in her finger joints. (R. 242). Campbell examined Claimant and recommended skilled rehabilitative therapy in conjunction with a home exercise program to increase muscle performance, reduce pain, and increase sensory integrity. (R. 242-43).

The final pertinent entry in the medical record details Claimant's follow-up with Dr. Daniel Nepomuceno on February 27, 2004. (R. 295). Claimant complained of excessive daytime sleepiness and fatigue and felt that her CPAP treatment had lost its effectiveness. (*Id.*). Dr. Nepomuceno was concerned about possible worsening of Claimant's obstructive sleep apnea and recommended that she undergo another sleep study. (*Id.*). On April 16, 2004, after Claimant had completed another sleep study, Dr. Nepomuceno adjusted Claimant's CPAP titration to 13 cm of water pressure. (R. 294).

### III.    Claimant's Testimony

Claimant was born on August 10, 1953. (R. 300). At the time of the hearing, Claimant was 5' 1" tall and weighed 190 pounds. (*Id.*). She is married and resides with her husband. (*Id.*). Claimant graduated high school but has no other formal education

or professional training.  (*Id.*).  She has a valid driver's license and drives "every day."

(R. 301).

Claimant alleged disability since July 31, 1990.  (R. 63).  Claimant initially

testified that she had not worked since July 1990, but later admitted that she had

worked for "a couple of months" for Manpower in 1996.[2]  (R. 301, 302).  Claimant further

testified that her hours at Manpower were from 9 AM until 1 PM and that her job

consisted entirely of answering phones with no lifting required.  (R. 302).  Claimant also

testified that she had ended her employment at Manpower because "it was getting too

hard to keep up with [the] pace."  (*Id.*).

Prior to the date of her alleged disability, Claimant had worked at Sears Service

Center.  (R. 64, 303-304).  She reported that her duties included taking part orders by

phone, retrieving the appropriate part from the storeroom, and bringing the part to the

front of the store.  (R. 303).  Claimant reported that her job required her to lift a

maximum of 10 pounds and frequently lift less than 10 pounds.  (R. 64).  Claimant

stated that her hours at Sears were limited to 9 AM to either 1 PM or 2 PM "because

that's all [she] could do."  (R. 303-304).  She said that working at Sears was "difficult"

and "extremely hard to do" and that she had quit because it became too difficult to

maintain the required pace.  (R. 304).  Claimant testified that she has not held a full-time

job where she had to work eight hours a day at any point during the previous fifteen

_____

[2]Claimant also testified that she had done bookkeeping at home for her husband's
cleaning business for one hour a week in order to earn quarters for her Social Security benefits.
(R. 63, 301).  According to the hearing transcript, ALJ Boyle indicated that this employment was
of no consequence to his inquiry since the bookkeeping did not constitute "substantial gainful
activity."  (R. 302).

years.  (R. 303-304).

When asked about the extent of her capabilities following the end of her employment at Sears but prior to her DLI in 1996, Claimant said that the maximum distance she could walk on level ground was "from the parking lot into the building" in which the administrative hearing was held.  (R. 305).  Claimant testified that when she walked that distance she felt weakness in her legs as well as pain in her hip.  (*Id.*). Claimant further testified that she really began to notice these symptoms in either 1991 or 1992.  (R. 306).  She also testified that she began to suffer from irregular heartbeat at roughly the same time in the early 1990s.  (*Id.*).  Claimant further stated that these problems with walking persisted until the time of the hearing and that she had started using a cane the previous fall.  (R. 63, 305).

Claimant then testified that she experienced problems with her ability to sit down for an extended period of time prior to her DLI.  (R. 306).  She stated that sitting was "tiring" and would put pressure on a portion of her back, creating a "sore spot."  (*Id.*). After her back became sore, Claimant explained that her legs would then fall asleep. (*Id.*).  Claimant further testified that she could sit for a period of 60 to 90 minutes at a time without having to get up.  (R. 307).   After that time, Claimant stated that she would have to stretch out on the couch or get up to walk around.  (*Id.*).

Claimant also claimed that she could not perform work in the future because she had difficulty moving around, specifically walking and standing, and because she tired out very quickly.  (R. 63).

**IV.    Medical Expert's Testimony**

12

Dr. John Cavenagh testified as the medical expert ("ME") at the hearing. (R. 307). Dr. Cavenagh testified that he had reviewed the medical evidence submitted by Claimant and that he had found it to be adequate for his purposes. (*Id.*). Dr. Cavenagh then recited the relevant medical evidence and testified that Claimant suffered from postpolio syndrome with lifelong spinal deformity, gait changes, chronic back pain, fatigability, reflex changes in the legs, decreased range of motion in the lower extremity joints, and chronic sleep apnea. (R. 309). Dr. Cavenagh further testified that Claimant's impairments did not appear to meet or equal a listing-level impairment but added that her impairments would limit her level of work activity to sedentary at most. (R. 309-10). ME Cavenagh noted Claimant's testimony regarding her sit/stand pattern and her inability to work for more than four hours at a time. (R. 310). He stated that those things would further impact Claimant's work level activity. (*Id.*).

The ME testified that the record demonstrated that Claimant's impairments existed prior to her DLI. (*Id.*). Dr. Cavenagh also stated that Claimant's testimony at the hearing indicated that she was limited to sedentary work at most prior to her DLI. (*Id.*). ALJ Boyle then asked the ME whether the medical evidence, as opposed to the testimony of Claimant herself, included any information regarding Claimant's work level activity. (*Id.*). Dr. Cavenagh responded that the records reflected that Claimant was active in taking care of her grandchild and maintaining her household but added that these activities allow for more freedom to take breaks and rest periods than any place of employment. (*Id.*).

Dr. Cavenagh testified that he did not think there was any conflict between the

medical evidence and Claimant's testimony, rather that "neither one quite covers the other." (R. 310-11). Dr. Cavenagh stated that if he were to look solely at Claimant's medical records, he would conclude that she would be limited to sedentary work activity. (R. 311). Dr. Cavenagh further testified that the limitations on Claimant's hourly work were very reasonable and something she may have experienced prior to 1996. (*Id.*).

**LEGAL ANALYSIS**

**I.      Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g)*; Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the

important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning."
*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## II.    Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that Claimant had worked following the alleged onset of disability but that her earnings did

15

not constitute substantial gainful activity. (R. 16). At step two, the ALJ found that the medical evidence showed that Claimant's scoliosis and hypertension were severe impairments. (*Id*.). At step three, the ALJ determined that Claimant's impairments were not "'severe' enough to meet or medically equal, either singly or in combination, one of the impairments in the Listing of Impairments (Listings) (Appendix 1, Subpart P, Regulations No. 4)." (*Id*.). Next, the ALJ found that Claimant had the physical residual functional capacity to "perform the full range of sedentary work." (R. 18). At step four, the ALJ determined that Claimant could not perform any past relevant work because the demands of her work as an order filler exceeded her capacity for sedentary work. (*Id*.). At step five, with a residual functional capacity for the full range of sedentary work, the ALJ directed a finding of "not disabled" pursuant to Medical-Vocational Rule 201.27. (R. 19).

Claimant argues that the ALJ erred because he ignored medical evidence and ME testimony favorable to the Claimant. She further contends that the ALJ failed to assess her alleged postpolio syndrome and obesity. Claimant also argues the ALJ erred in making his RFC determination because he failed to perform a function-by-function analysis of Claimant's ability to perform work-related activities. Finally, Claimant argues that the ALJ's credibility determination is not supported by substantial evidence because he failed to consider all of the relevant medical evidence.

## III.    The ALJ's Step Two Analysis

### A.    The ALJ Failed to Consider the Evidence it Its Entirety

At step two, the ALJ is required to assess Claimant's physical impairments and

determine whether "any impairment or combination of impairments. . . significantly limits [her] physical or mental ability to do basic work activities." *See* C.F.R. § 404, 1520(c); SSR 96-3. Claimant argues that the ALJ failed to consider evidence favorable to her when determining the severity of her impairments. An ALJ is not required to address every piece of testimony and evidence. *Stephens v. Hecker,* 766 F.2d 284, 287 (7th Cir. 1985). However, an ALJ may not select and discuss only that evidence that favors his ultimate conclusion. *Diaz*, 55 F.3d at 307. Rather, the ALJ must articulate, at some minimum level, his analysis of the evidence to allow the reviewing court to trace the path of his reasoning. *Id.* Furthermore, the ALJ's decision must be based on consideration of *all* relevant evidence. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1998).

ALJ Boyle's step two evaluation contains no indication that he considered portions of both the ME's testimony and the medical evidence that were favorable to the Claimant. The ALJ stated that the ME "testified that the evidence show[ed] that the [C]laimant had scoliosis and hypertension prior to" her DLI. (R. 16). However, Dr. Cavenagh also testified that Claimant's impairments included postpolio syndrome, gait changes, chronic back pain, fatigability, reflex changes in the legs, decreased range of motion in the lower extremity joints, and chronic sleep apnea *before* her DLI. (R. 309-10). The ALJ's step two analysis does not mention any of this testimony.

The ALJ concluded his step two analysis by stating that "[t]here is no medical evidence of any other impairment prior to [the Claimant's] date last insured." (R. 16). However, the medical records for the period prior to Claimant's DLI contain references

to several other impairments including: marked kyphoscoliosis of the thoracolumbar spine, severe scoliosis of the lumbar spine, deformity of the rib cage, a marked deformity of the pelvis, arthritis of the left hip, spondylosis (degeneration of the vertebral disks) and possible obesity. (R. 119, 124, 280-83). The ALJ cannot ignore entire lines of evidence but must consider and discuss all relevant evidence. *Diaz*, 55 F.3d at 307; *Ray*, 843 F.2d at 1002.

Because the ALJ failed to consider all of the important evidence, we cannot trace the path of his reasoning. Therefore, remand is warranted. *Id.* (recognizing that an ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required); *Carlson*, 999 F.2d at 181.[3]

### B. The ALJ Failed to Analyze Whether Claimant Suffered From Postpolio Syndrome

Next, Claimant argues that the ALJ failed to determine whether she suffered from postpolio syndrome. Any impairment that is "established by medical evidence consisting of signs, symptoms, and laboratory findings" must be examined before an ALJ can determine whether an individual is disabled.[4] *See* 20 C.F.R. § 404.1508. The

---

[3] The ALJ's error in failing to discuss medical evidence and ME testimony favorable to the Claimant also affects his step three analysis and his RFC determination. On remand, the ALJ must evaluate and discuss this favorable evidence at step three and in connection with his RFC determination.

[4] Symptoms are "[the claimant's] own description of [her] physical or mental impairment." 20 C.F.R. § 404.1528(a). Signs are observable anatomical, physiological or psychological abnormalities that must be shown by medically acceptable clinical diagnostic techniques. 20 C.F.R. § 404.1528(b). Laboratory findings are anatomical, physiological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques, including X-rays. 20 C.F.R. § 404.1528(c).

ALJ must also conduct "a careful evaluation of the medical evidence that describe the impairments" in order to make an informed judgment about the severity of the impairment. SSR 96-3.

The Social Security Administration has identified postpolio sequelae as an impairment that can be the basis for a finding of disability when accompanied by appropriate signs and laboratory findings. SSR 03-1p. Postpolio sequelae refers to disorders, such as postpolio syndrome, that manifest late in the lives of polio survivors but are etiologically linked to a previous polio infection. *Id.* Signs and symptoms of postpolio syndrome include fatigue, joint pain and skeletal deformities such as scoliosis. *Id.* If the medical findings support a reasonable link between the prior polio infection and the present manifestation of postpolio syndrome, the ALJ should find that the individual in question has postpolio sequelae. *Id.*

Here, the ALJ failed to evaluate the considerable medical evidence and ME testimony that suggested that Claimant suffered from postpolio syndrome prior to her DLI. As indicated above, ALJ Boyle's step two analysis includes only hypertension and scoliosis among Claimant's impairments and concludes "there is no medical evidence of any other impairment prior to [Claimant's] date last insured." (R. 16). However, medical records for the period prior to Claimant's DLI contain references to her previous polio infection. (R. 119, 125, 281). Additionally, medical records prior to Claimant's DLI include laboratory findings from x-rays that document Claimant's marked kyphoscoliosis of the thoracolumbar spine, severe scoliosis of the lumbar spine, deformity of the rib cage and marked deformity of the lumbar spine and pelvis. (R. 280-83). Furthermore,

the record also indicates that Claimant listed left hip pain among her symptoms prior to her DLI. (R. 119, 281). Significantly, the ME testified that Claimant suffered from "fatigability" and "postpolio syndrome" prior to her DLI. (R. 309-10). In evaluating Claimant's RFC, the ALJ referenced a 2002 medical record and conceded that Claimant "now has postpolio syndrome." (R. 17). However, the ALJ failed to discuss any of the pre-DLI medical evidence or ME testimony set forth above during his step two analysis or his RFC determination. (R. 16-17).

While this evidence and testimony does not conclusively demonstrate that Claimant suffered from postpolio syndrome prior to her DLI, such credible and relevant medical evidence simply cannot be ignored by the ALJ. *Diaz*, 55 F.3d at 307. Instead, the ALJ should have evaluated and discussed the aforementioned medical evidence and the ME's testimony and determined whether or not it was sufficient to find that Claimant suffered from postpolio syndrome. The ALJ must do so on remand. If the ALJ finds that Claimant suffered from postpolio syndrome prior to her DLI, the ALJ must analyze whether Claimant has postpolio sequelae in accordance with SSR 03-1p.

### C.    The ALJ Failed to Consider Claimant's Alleged Obesity

The SSA outlined its policies regarding the role of obesity in disability claims in Policy Interpretation Ruling SSR 02-1p. SSR 02-1p requires an ALJ to consider obesity in determining whether an individual has a medically determinable impairment. SSR 02-1p. If there is no diagnosis of obesity but the evidence includes clinical notes or other medical records showing consistently high body weight, the ALJ should either consult a medical source or, as is done in most cases, use his judgment "to establish the

presence of obesity based on the medical findings and other evidence in the case record." *Id.*

Here, there is no diagnosis of obesity prior to Claimant's DLI. However, Claimant's medical records contain multiple references to her excessive weight prior to her DLI. On May 4, 1994, Claimant's cardiologist, Dr. Wang, indicated that she "had put on weight since 1991" and also described her as "moderately obese." (R. 119, 124). Additionally, Dr. Nora Miller, Claimant's primary care physician, noted that Claimant was 5' 1" and weighed 168 pounds on February 22, 1996. (R. 274). Based on these medical records, the ALJ should have evaluated whether Claimant's alleged obesity constitutes a medically determinable impairment in accordance with SSR 02-1p. The ALJ must do so on remand.[5]

## IV. The ALJ's RFC Determination

RFC is the most an individual can still do despite his or her limitations. SSR 96-8p. "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* Claimant argues that the ALJ erred in making his RFC determination by failing to abide by SSR 96-8p. We agree.

In determining a claimant's RFC, the ALJ must first identify the individual's

---

[5] If the ALJ finds that Claimant's alleged obesity is a medically determinable impairment, the ALJ must follow the remaining directives of SSR 02-1p.

functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. *Id.* The ALJ must separately consider and discuss the Claimant's ability to perform each of the seven strength demands – sitting, standing, walking, lifting, carrying, pushing and pulling – on a "regular and continuing basis" of eight hours a day, five days a week. *Id.* This function-by-function analysis must be performed before an ALJ can express a Claimant's RFC in terms of the exertional levels of work, such as sedentary, light or medium. *Id.*

Here, the ALJ recited his version of the ME's testimony, analyzed the available medical opinions and concluded "there is no convincing evidence that, on [or] before June 30, 1996, the claimant did not have residual functional capacity to perform the full range of sedentary work." (R. 17-18). ALJ Boyle failed to conduct a function-by-function analysis of Claimant's abilities as required by SSR 96-8p. Because the ALJ failed to comply with SSR 96-8p, we cannot conclude that his RFC determination is supported by substantial evidence and free from legal error. Therefore, remand is appropriate.

On remand, the ALJ must comply with SSR 96-8p. A new RFC assessment with a proper function-by-function analysis seems particularly appropriate here because, as discussed above, the ALJ failed to consider all of the important medical evidence.

## V.    The ALJ's Credibility Finding

Next, the Claimant contends that the ALJ erred in making his credibility determination. To succeed on this ground, Claimant must overcome the highly deferential standard that we accord to the ALJ's credibility determination. Because the

ALJ is in a far superior position to assess the credibility of a witness, we will only reverse the ALJ's credibility finding if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must abide by the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p.

Here, the ALJ mentioned that Claimant's x-rays revealed skeletal deformities of her spine, pelvis, and ribs but failed to discuss his analysis of these laboratory findings and explain their relationship to the Claimant's allegations of pain and other symptoms. (R. 17). Claimant's x-rays are laboratory findings that document the presence of physiological phenomena which may be relevant to determining the credibility of her allegations of disabling pain and other symptoms. *See* C.F.R. 404.1528(c) (including x-rays among acceptable "laboratory findings"). As such, they merit further examination and discussion by the ALJ. Furthermore, as discussed above, the ALJ failed to consider medical evidence and ME testimony favorable to the Claimant. Therefore, it is unclear whether his credibility assessment was based on a consideration of all the evidence in the case record.

Because the ALJ failed to comply with SSR 96-7p, his credibility determination cannot stand. *Brindisi*, 315 F.3d at 788 (citing the ALJ's failure to comply with SSR 96-

7p as grounds for remand).  On remand, the ALJ must demonstrate that he considered all of Claimant's medical signs and laboratory findings for the period prior to Claimant's DLI in accordance with SSR 96-7p.

**CONCLUSION**

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: August 27, 2007**